United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DARLENE KENNEDY,<br><br>        Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br>Administration,<br><br>        Defendant. | Case No. 3:14-cv-04256-LB<br><br>**ORDER GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING DEFENDANT'S CROSS-<br>MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF Nos. 17, 20] |

**INTRODUCTION**

The plaintiff  Darlene Kennedy moves for summary judgment seeking judicial review of a

final decision by the Social Security Administration denying her disability benefits for her claimed

disabilities of Post-Traumatic Stress Disorder ("PTSD") and Depression. (Motion for Summary

Judgment, ECF No. 17.[1]) The Administrative Law Judge ("ALJ") found that Ms. Kennedy had

severe impairments of PTSD and depression but declared her not disabled and denied Social

Security Income ("SSI") benefits. (Administrative Record ("AR") at 28.) The Commissioner

_____

[1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page
numbers at the tops of the documents.

1  opposes Ms. Kennedy's motion for summary judgment and cross-moves for summary judgment.

2  (Cross-Motion for Summary Judgment, ECF No. 20.)

3      Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

4  without oral argument. All parties have consented to this court's jurisdiction. (Consent Forms,

5  ECF Nos. 6, 11.) Upon consideration of the administrative record, the parties' briefs, and the

6  applicable legal authority, the court grants in part Ms. Kennedy's motion for summary judgment,

7  denies the Commissioner's cross-motion for summary judgment, and remands the case for further

8  proceedings consistent with this order.

9                                    **STATEMENT**

10  **I.  PROCEDURAL HISTORY**

11      On October 11, 2011, Ms. Kennedy filed a Title II application for social security disability

12  insurance benefits ("SSDI"), and Title XVI application for supplemental security income ("SSI").

13  In both applications, Ms. Kennedy alleged that her disabilities began on January 1, 2008. Both

14  claims were initially denied on July 5, 2012 (AR 132–35), and upon reconsideration (AR 143–49.)

15  Ms. Kennedy timely filed a request for a hearing before an ALJ. (AR 150.) The ALJ hearing was

16  held by video on August 27, 2013. (AR 19.) Ms. Kennedy was represented at the hearing by her

17  counsel, Eric Shore. Joy Yoshioka, a vocational expert ("VE"), also testified. (AR 19.) The ALJ

18  denied Ms. Kennedy's request on November 18, 2013, finding that Ms. Kennedy had not been

19  under a disability as defined in the Social Security Act from October 31, 2010 through the date of

20  the decision. (AR 28.) The ALJ found that, "[c]onsidering Ms. Kennedy's age, education, work

21  experience, and residual functional capacity ("RFC"), there are jobs that exist in significant

22  numbers in the national economy that Ms. Kennedy can perform." (AR 27). Ms. Kennedy timely

23  requested appeal of the ALJ's ruling on December 30, 2013. (AR 15.)  The Appeals Council

24  denied Ms. Kennedy's request for review on July 22, 2014. (AR 1.)

25      Ms. Kennedy timely sought judicial review of the final decision denying her SSI benefits.

26  (Complaint, ECF No. 1.) On March 3, 2015, the Commissioner answered the complaint. (Answer,

27  ECF No. 15.) On March 31, 2015, Ms. Kennedy filed her motion for summary judgment. (Motion,

28  ECF No. 17.)  The Commissioner filed an opposition and cross-motion for summary judgment on

May 28, 2015 (Cross-Motion, ECF No. 20.) On June 18, 2015, Ms. Kennedy filed a response. (Response, ECF No. 23.)

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

### A. Work History

#### 1. Assistant Manager at Denny's Restaurant (January 2003-March 2008)

In 2008, while Ms. Kennedy was working as a manager at a Denny's Restaurant, she was held up at gunpoint. (AR 222.) Ms. Kennedy attributes her PTSD to this event. (*See e.g.* AR 294.) Ms. Kennedy states that she was fired from Denny's after this event for failing to follow procedures. (AR 222.)

#### 2. Cafeteria Manager/Bartender at the Palomino Room (August 2008-November 2009)

Subsequent to the incident at Denny's, Ms. Kennedy got a job at the Palomino Room as a cafeteria manager and bartender. (AR 59-60.) Ms. Kennedy was fired from that position when she took money from the safe. (*Id.*) Ms. Kennedy served eight months in prison as a result of this action. (*Id.*) She was released from prison in October of 2010 and did not return to work. (AR 61.)

### B. Medical Evidence

Ms. Kennedy received all of her relevant medical treatment from the Tehama County Health Services Agency Mental Health Division during the period July 2011 to October 2013. During that time, she received treatment from a number of different treatment providers.

#### 1. K. Dusina, Treating Clinician at Tehama Community Crisis Response Unit

On July 6, 2011, Ms. Kennedy sought treatment from the Tehama County Health Services Agency Community Crisis Response Unit. (AR 315.) Ms. Kennedy reported feeling very depressed, anxious, and afraid of the dark. (*Id.*) She stated that she hid in her bedroom once the sun goes down and that she was afraid to be alone. (*Id.*)

The clinician found Ms. Kennedy's behavior to be "sensitive," her mood to be depressed and anxious with a restricted range of affect, and her insight and judgment to be fair. (AR 317.) The clinician diagnosed Ms. Kennedy with a severe/moderate mood disorder. (AR 319.)

The clinician noted that Ms. Kennedy had a current functional impairment with difficulty or inability to maintain employment and "significant impairment" in her living arrangement,

United States District Court
Northern District of California

activities of daily living, education/occupation/job, financial/economic issues, access to healthcare, and social relationships. (*Id.*) The clinician noted no suicidal/homicidal thoughts, no crisis utilizations within the past year, no psychosis, no medications, and no inpatient utilization within the past two years. (*Id.*)

The clinician stated additional risk factors of a history of trauma/abuse, probation/parole, and chronic unemployment. (*Id.*) The clinician calculated Ms. Kennedy's "medical necessity" to be "minimal." The clinician referred Ms. Kennedy for outpatient assessment and recommended individual counseling at the Tehama County Mental Health facility. (AR 318.)

### 2. Bonnie Hill, LCSW

On July 8, 2011, Bonnie Hill, LCSW evaluated Ms. Kennedy. Ms. Kennedy reported:

> Depression, constantly tearful, hopeless, helpless, worthless, low self-esteem, anhedonia, [suicidal ideation] without intent, plan, fatigue, can't sleep at all; if falls asleep, awakens every hour. . . . Also extremely anxious with episodes of heart racing, shaking, dizziness, lightheadedness, feeling she's going to pass out. . . . [E]xaggerated startle response, has to face doorways at all times (back to corners or solid walls) Very fearful at night. Panic attacks day and night. Specific [nocturnal] phobia. PTSD type sxs.

(AR 308.) Ms. Hill assessed Ms. Kennedy as depressed and very tearful and noted that Ms. Kennedy's sleep was interrupted and decreased. (AR 309.) Ms. Kennedy's thought process, however, was clear and organized. (*Id.*) Ms. Hill diagnosed Ms. Kennedy with major recurrent, severe depression, a specific nocturnal phobia, a panic disorder with agoraphobia, and PTSD. (AR 310.)

Ms. Hill stated that Ms. Kennedy had an "intensive medical necessity" and noted "significant impairment" in "education/occupation/job," "social relationships," and "psychosocial/environmental" areas. (AR 311.) Ms. Hill also noted additional risk factors for Ms. Kennedy in the form of a history of trauma/abuse, chronic homelessness, and chronic unemployment with no support system and family risk factors of substance abuse. (*Id.*)

Ms. Hill found Ms. Kennedy to meet high-risk profile criteria for "suicidal/homicidal thoughts" and recommended a "crisis visit within the month." (*Id.*) Ms. Hill also recommended that Ms. Kennedy undergo a medical evaluation, engage in individual counseling, and avail herself of "Rehab services." (AR 310.)

United States District Court
Northern District of California

### *3. Jon Malan, D.O., Treating Physician*

On July 28, 2011, Dr. Malan conducted Ms. Kennedy's medical evaluation. (AR 294.) Ms. Kennedy reported that she "has had a great deal of [difficulty] sleeping, interacting with people[,] is jumpy and nervous[, and every] night she goes home and locks herself in her room and spends most of the time sitting against the wall in the corner watching the door." (*Id.*) Dr. Malan diagnosed Ms. Kennedy with depression, anxiety, and posttraumatic stress disorder. (*Id.*) The doctor observed that Ms. Kennedy "obviously does not sleep very well" and that she was "visibly distraught and having a very difficult time." (*Id.*) Dr. Malan prescribed Prozac to Ms. Kennedy and a two-week course of Zyprexa "to try to get her boosted out of the fairly significant depression and anxiety that she is having right now to a more manageable state," which could then be treated by the Prozac alone. (*Id.*)

### *4. Bonnie Hill, LCSW*

On November 3, 2011, Ms. Kennedy met with Ms. Hill for her first treatment session. (AR 313-14.) Ms. Hill found Ms. Kennedy to be depressed, restless, and tearful, but cooperative. (AR 313.) "She was initially very tearful and depressed." (*Id.*) Ms. Kennedy reported that if she were at home alone at night, she was too fearful to go outside. Ms. Kennedy attributed her fear, anxiety, and depression to having been robbed at gunpoint while working at Denny's in 2008. (*Id.*) Ms. Kennedy reported that the Prozac she had recently been prescribed "helped make her be less tearful." (*Id.*)

### *5. Elyse Eskridge, M.D., Treating Physician*

On November 22, 2011, Dr. Eskridge performed a psychiatric evaluation of Ms. Kennedy. (AR 305-07.) Ms. Kennedy reported that she had "been depressed all my life . . . but, I've made excuses." (AR 305.) Ms. Kennedy reported a "more pronounced anxiety and actual panic" since the 2008 robbery. (*Id.*) Ms. Kennedy also reported to Dr. Eskridge that she was afraid to be alone and was nervous in crowds and that she was afraid of the dark. (*Id.*) Dr. Eskridge found Ms. Kennedy to be tearful and depressed, with cooperative attitude, and her thought process to be clear and organized. (AR 306.) Dr. Eskridge diagnosed Ms. Kennedy with Depressive Disorder "NOS." (AR 307.) Ms. Kennedy told Dr. Eskridge that the Prozac initially helped with her crying spells,

United States District Court
Northern District of California

1    but not her anxiety. (AR 305.) Dr. Eskridge discontinued Ms. Kennedy on Prozac and prescribed

2    Zoloft and therapy. (AR 307.)

3        On December 20, 2011, Ms. Kennedy saw Dr. Eskridge again. Ms. Kennedy reported "feeling

4    better" with no crying spells, more energy, and better sleep, although she was still "somewhat

5    isolative." (AR 312.) Dr. Eskridge said that Ms. Kennedy had a neutral mood, reactive/bright

6    affect, calm behavior, a cooperative attitude, and a clear thought process. (*Id.*) Dr. Eskridge

7    continued to diagnose Ms. Kennedy with a Depressive Disorder and to prescribe Zoloft. (*Id.*)

8            *6. Lon T. Clark, LMFT, Treating Therapist*

9        On January 11, 2012, Ms. Kennedy met with Mr. Clark for an initial session. Mr. Clark

10   recorded Ms. Kennedy's "presenting problems" as depression and anxiety manifested in isolation,

11   poor sleeping and eating patterns, hopelessness, 4–5 panic attacks per week, poor concentration

12   and confusion, difficulty making decisions, and lack of interest in all activities. (AR 337.) Mr.

13   Clark's notes state that Ms. Kennedy was depressed and calm, but not tearful, with a cooperative

14   and open attitude. (*Id.*) He also reported her as having suicidal thoughts but no intent, means or

15   plan. (*Id.*) Mr. Clark diagnosed Ms. Kennedy with a major depressive disorder, which was

16   recurrent and severe. (*Id.*)

17           *7. Wanda Cossairt, LCSW, Treating Therapist*

18       On January 17, 2012, Ms. Kennedy met with Wanda Cossairt, LCSW to develop a Mental

19   Health Recovery Plan. (AR 331-32.) The Recovery Plan states that Ms. Kennedy has a major

20   depressive disorder and also a panic disorder with agoraphobia. (AR 331.) Ms. Cossairt found

21   Ms. Kennedy's barriers and functional impairments included "[e]xtreme terrifying fear and

22   anxiety; little income; impaired ability to pay bills; a belief that [her] credibility is gone after being

23   fired from [her] job; [and] a belief that [her] career is gone" because of her felonies. (*Id.*) The

24   recovery plan included Ms. Kennedy's attending scheduled therapy sessions to manage her fear

25   and anxiety. (AR 332.)

26           *8. Lon T. Clark, LMFT, Treating Therapist*

27       On February 6, 2012, Ms. Kennedy saw Mr. Clark. (AR 336.) His notes state that Ms.

28   Kennedy was depressed, calm, tearful, and without psychoses or suicidal thoughts, and that she

United States District Court
Northern District of California

had a cooperative and open attitude. (AR 336.) Mr. Clark recorded Ms. Kennedy as "very tearful in session today discussing her unmanageable fear and anxiety." (*Id*.)

Ms. Kennedy next saw Mr. Clark on February 17, 2012. (AR 335.) He found her to be depressed, calm, tearful, without psychoses or suicidal thoughts, and to have a cooperative and open attitude. (*Id*.) He also noted that Ms. Kennedy had significant depression and fear that impacted her ability to have quality relationships and quality of life and to work. (*Id*.)

### 9.  James Young, MD, Treating Physician

On February 21, 2012, Dr. Young met with Ms. Kennedy for the first time. (AR 334.) Dr. Young's notes state that Ms. Kennedy was depressed and fidgety, but with a cooperative attitude and clear thought process. (*Id*.) He added that Ms. Kennedy was "very anxious" and "tearful." (*Id*.) Dr. Young diagnosed Ms. Kennedy with PTSD, a major depressive disorder, and a panic disorder with agoraphobia. (*Id*.) Dr. Young doubled Ms. Kennedy's dosage of Zoloft and added Ativan. (*Id*.)

### 10. Lon T. Clark, LMFT, Treating Therapist

On March 5, 2012, Ms. Kennedy again visited Mr. Clark. (AR 333.) Mr. Clark said Ms. Kennedy exhibited the same symptoms he noted on her prior visit with him. (*Id*.) Mr. Clark noted that Ms. Kennedy was "making progress toward managing her fear and making small changes in the way she relates to others." (*Id*.)

### 11. James Young, MD, Treating Physician

On March 20, 2012, Ms. Kennedy saw Dr. Young again. (AR 442.) Dr. Young found Ms. Kennedy to be depressed, fidgety, and tearful, but with a cooperative attitude, and a clear thought process. (*Id*.) He added that Ms. Kennedy was "very anxious." (*Id*.) Ms. Kennedy reported that she was afraid of her new medication and that she had only taken the prescribed Ativan on one occasion. (*Id*.) Dr. Young described Ms. Kennedy's current functioning as "very limited" and stated that she was to continue with bi-weekly therapy. (*Id*.)

### 12. Lon T. Clark, LMFT, Treating Therapist

Ms. Kennedy saw Mr. Clark on March 26, 2012. (AR 423.) Mr. Clark's notes state that Ms. Kennedy was exhibiting the same symptoms he noted on her prior visits with him. (*Id*.) Mr. Clark

United States District Court
Northern District of California

stated that Ms. Kennedy's "depression is preventing her from setting strong boundaries, and others tend to take advantage of her." (*Id.*)

Ms. Kennedy next saw Mr. Clark on April 9, 2012. (AR 422.) Mr. Clark's notes found Ms. Kennedy to generally the same as on her prior visits with him, except that instead of being calm, she was fidgety. (*Id.*) Mr. Clark's notes stated that Ms. Kennedy "is overwhelmed with the dysfunctional dynamics with her family, in which she plays the scapegoat." (*Id.*)

### 13. James Young, MD, Treating Physician

On April 9, 2012, Ms. Kennedy also saw Dr. Young for a scheduled follow-up appointment. (AR 441.) Dr. Young found Ms. Kennedy to have acute intense bereavement over her dying brother. (*Id.*) His notes state that Ms. Kennedy was, "upset, tearful, anxious" and that she was experiencing guilt. (*Id.*) Dr. Young described Ms. Kennedy's current functioning as "very limited." (*Id.*) Dr. Young changed Ms. Kennedy's prescription from Ativan to Clonazepam and scheduled her to return in two weeks as well as to continue in counseling. (*Id.*)

### 14. Lon T. Clark, LMFT, Treating Therapist

On April 23, 2012, Ms. Kennedy saw Mr. Clark. (AR 421.) Mr. Clark found that Ms. Kennedy generally exhibited the same symptoms he noted on her prior visits with him, except that instead of fidgety, she was calm. (*Id.*) Mr. Clark said that Ms. Kennedy "continues to have PTSD symptoms over being robbed" four years before, and that she also reported guilt and shame related to family dysfunction. (*Id.*)

### 15. James Young, MD, Treating Physician

On April 26, 2012, Ms. Kennedy saw Dr. Young. (AR 440.) Dr. Young found Ms. Kennedy to be depressed, but cooperative and with a clear thought process. (*Id.*) Dr. Young added that Ms. Kennedy was tearful and agitated. (*Id.*) Dr. Young described her current functioning as "limited." (*Id.*)

### 16. Lon T. Clark, LMFT, Treating Therapist

Ms. Kennedy saw Mr. Clark on May 21, 2012. (AR 419.) Mr. Clark stated Ms. Kennedy was exhibiting the same symptoms he noted on her prior visits with him. (*Id.*) Mr. Clark said that Ms. Kennedy's brother and grandmother just died. "She spent the session discussing her grief." (*Id.*)

United States District Court
Northern District of California

### 17. Treating Physician[2]

On May 29, 2012, Ms. Kennedy visited a different doctor. (AR 439.) The doctor stated that Ms. Kennedy was exhibiting same symptoms Mr. Clark had noted on her prior visit with him. (*Id.*) The doctor added that Ms. Kennedy was "tearful," and he increased her Zoloft prescription. (*Id .*)

### 18. James Young, MD, Treating Physician

Ms. Kennedy next saw Dr. Young on July 31, 2012. (AR 437.) Dr. Young found Ms. Kennedy to be depressed and tearful but cooperative. (*Id.*) Dr. Young stated that Ms. Kennedy was experiencing grief over the death of her brother and grandmother and also the denial of her Social Security benefits. Dr. Young described Ms. Kennedy's current functioning as "sinking into a dark hole" and that she was getting "less functional." (*Id.*) Dr. Young changed Ms. Kennedy's prognosis from "good" to "guarded." (*Id.*)

### 19. Lon T. Clark, LMFT, Treating Therapist

On August 9, 2012, Ms. Kennedy saw Mr. Clark. (AR 418.) Mr. Clark said Ms. Kennedy was exhibiting same symptoms he noted on her prior visit with him. (*Id.*) Mr. Clark noted that Ms. Kennedy "has regressed recently. She is having major PTSD symptoms causing her to isolate & lock herself in her room, especially at night. She is unable to socialize or work." (*Id.*)

Ms. Kennedy next saw Mr. Clark on August 13, 2012. (*Id.*) Mr. Clark states that Ms. Kennedy continues to feel very much anxious and afraid. (*Id.*) Mr. Clark discussed treatment options with Ms. Kennedy. (*Id.*)

Ms. Kennedy saw Mr. Clark on August 21, 2012. (AR 415.) Mr. Clark states that Ms. Kennedy was exhibiting the same symptoms he noted on her prior visit with him. (*Id.*) Mr. Clark also stated that Ms. Kennedy "continued to slowly tell her trauma narrative" and to "process [her] feelings." (*Id.*)

### 20. James Young, MD, Treating Physician

On August 29, 2012, Ms. Kennedy saw Dr. Young. (AR 436.) Dr. Young found Ms. Kennedy to be depressed but cooperative with a clear thought process. (*Id.*) The doctor's notes state that

---

[2] The physician's signature is illegible.

Ms. Kennedy is "tearful" and "agitated"  and that she is "generally worse" with increased anxiety and agoraphobia. (*Id*.) Dr. Young notes a decrease in her current level of functioning and states a relationship to the symptoms and her agoraphobia. (*Id*.) Dr. Young increased Ms. Kennedy's dosage of Zoloft and Clonazepam. (*Id*.)

On September 6, 2012, Ms. Kennedy saw Dr. Young again. (AR 435.) Dr. Young's notes state that Ms. Kennedy returned early to discuss her SSI benefits. (*Id*.) Dr. Young found Ms. Kennedy to be depressed, tearful and anxious. (*Id*.) The treatment notes state that Ms. Kennedy's symptoms persist but that she was not experiencing any side effects from the medication. (*Id*.)

### 21. Lon T. Clark, LMFT, Treating Therapist

On September 10, 2012, Ms. Kennedy saw Mr. Clark. (AR 413.) Mr. Clark did not state any change in Ms. Kennedy's symptoms. (*Id*.) Mr. Clark stated that Ms. Kennedy "continues to isolate" and that the challenge in her therapy "is to increase social activity." (*Id*.)

### 22. James Young, MD, Treating Physician

On September 28, 2012, Ms. Kennedy saw Dr. Young. (AR 434.) Dr. Young found Ms. Kennedy to be depressed and tearful, but cooperative, and with a clear thought process. (*Id*.) Doctor Young notes that Ms. Kennedy was anxious and tearful and that she was afraid of her son-in-law. (*Id*.) Dr. Young describes Ms. Kennedy's current functioning as "low" and states that she has anxiety. (*Id*.)

### 23. Lon T. Clark, LMFT, Treating Therapist

On October 2, 2012, Ms. Kennedy saw Mr. Clark. (AR 412.) Mr. Clark states that Ms. Kennedy exhibits the same symptoms he noted on her prior visits with him. (*Id*.) Mr. Clark notes that Ms. Kennedy "has gained insight" about her depression and fears. (*Id*.)

Ms. Kennedy next saw Mr. Clark on October 16, 2012. (AR 411.) Mr. Clark's notes state Ms. Kennedy "continues to have poor boundaries with others, but is making progress through adjustments." (*Id*.)

On October 23, 2012, Ms. Kennedy saw Mr. Clark again. (AR 410.) Mr. Clark said Ms. Kennedy was exhibiting the same symptoms he noted on her prior visit with him. (*Id*.) Mr. Clark increased the frequency of therapy from bi-weekly to weekly visits. (*Id*.)

### 24. James Young, MD, Treating Physician

On October 29, 2012, Ms. Kennedy saw Dr. Young. (AR 433.) Dr. Young found Ms. Kennedy to be depressed, fidgety, and tearful but cooperative and with a clear thought process. (*Id*.) The doctor's notes state that Ms. Kennedy was "anxious" but note an improved mood. (*Id*.) Dr. Young described Ms. Kennedy's current functioning as "limited" but he upgraded her prognosis to "good." (*Id*.) Dr. Young noted that Ms. Kennedy was still taking Clonazepam and Zoloft. (*Id*.)

### 25. Lon T. Clark, LMFT, Treating Therapist

Ms. Kennedy saw Mr. Clark on November 1, 2012. (AR 409.) Mr. Clark's notes said that Ms. Kennedy exhibited the same symptoms as on her prior visits with him. (*Id*.) Mr. Clark stated that he and Ms. Kennedy will meet weekly to increase her emotional control over her anxiety and fear. (*Id*.)

On November 13, 2012, Ms. Kennedy saw Mr. Clark. (AR 407.) Mr. Clark noted that Ms. Kennedy "remains in emotional depression." (*Id*.)

### 26. Dr. P. M.,[3] Treating Physician

On November 28, 2012 Ms. Kennedy visited Dr. P. M. (AR 431.) The doctor said Ms. Kennedy was exhibiting same symptoms Mr. Clark noted on her prior visit with him, but instead of being calm, she was anxious. (*Id*.) Dr. P. M. noted that Ms. Kennedy was becoming more depressed overall, and that the prescriptions were losing their clinical effectiveness. (*Id*.) The doctor added Bupropion to Ms. Kennedy's medical regimen. (*Id*.)

### 27. Lon T. Clark, LMFT, Treating Therapist

On December 10, 2012, Ms. Kennedy met with Mr. Clark. (AR 406.) Mr. Clark's notes said Ms. Kennedy exhibited the same symptoms he noted on her prior visits with him. (*Id*.) Mr. Clark stated that Ms. Kennedy "is making little progress in therapy" and that isolation is a problem.  He further stated that Ms. Kennedy is "not willing to move past her significant passivity." (*Id*.)

Ms. Kennedy next saw Mr. Clark on December 31, 2012. (AR 405.) At that visit Mr. Clark stated that Ms. Kennedy "continues to feel stuck in life, but is willing to make changes." (*Id*.)

---

[3] The doctor's full name is illegible.

1

### 28. Dr. P. M., Treating Physician

On January 4, 2013, Ms. Kennedy saw Dr. P. M. (AR 430.) The doctor noted that Ms.

Kennedy was doing "much better" with the addition of Buproprion. (*Id.*) Ms. Kennedy reported

side effects from the medicine. The treatment notes state that after she takes it "she feels 'drunk'

for a short bit" but that this feeling resolves in a short time. (*Id.*) Her diagnosis remained chronic

PTSD with a depressed mood and "impaired." (*Id.*) The doctor's notes say that Ms. Kennedy was

calm and happy, with a cooperative and open attitude, and that her thought process was clear and

organized. (*Id.*) The doctor decreased Ms. Kennedy's Clonazepam dosage. (*Id.*)

### 29. Treating Physician[4]

On March 4, 2013, Ms. Kennedy visited a new doctor. The doctor found Ms. Kennedy to be

restless and depressed, but with an open attitude and a clear thought process. (AR 429.) Ms.

Kennedy reported being depressed, anxious, fearful, and worried about her safety. (*Id.*) The doctor

diagnosed Ms. Kennedy with Bipolar disorder and PTSD. (*Id.*) The doctor discontinued Ms.

Kennedy's Zoloft prescription and added Depakote and Seroquel. (*Id.*)

### 30. Lon T. Clark, LMFT, Treating Therapist

On March 5, 2013, Ms. Kennedy met with Mr. Clark. (AR 404.) Mr. Clark found Ms.

Kennedy to be depressed and tearful but calm. (*Id.*) On March 15, 2013 Ms. Kennedy was

reassigned from Mr. Clark to a new treatment provider, Bernadette Hotze. (AR 403.)

### 31. Treating Physician

On March 25, 2013, Ms. Kennedy saw the same doctor she had seen on March 4, 2013. (AR

428.) The doctor found Ms. Kennedy to be depressed, but with an open attitude, and a clear

thought process. (AR 428.) The notes describe her current functioning as "impaired." (*Id.*) On this

second visit to the doctor, Ms. Kennedy reported that she was fearful to start the new medications,

that she had failed to take them, and that she was now more anxious. (*Id.*) The doctor encouraged

her to take her new medications. (*Id.*)

---

[4] The doctor's signature is illegible. Ms. Kennedy saw this doctor twice, once on March 4, 2013, and again on March 25, 2013.

United States District Court
Northern District of California

1

### 32. Dr. P. M., Treating Physician

2    On April 25, 2013, Ms. Kennedy again saw Dr. P. M. (AR 427.) The doctor stated Ms.

3    Kennedy exhibited the same symptoms Mr. Clark noted on her prior visit with him, but instead of

4    being calm, she was anxious. (*Id*.) The doctor noted that Ms. Kennedy's mood was more anxious

5    and depressed with the medicine changes. (*Id*.) Ms. Kennedy also reported side effects with the

6    Depakote and Seroquel prescriptions, and the doctor discontinued them and re-prescribed Zoloft

7    and Clonozepam. (*Id*.)

8

### 33. Bernadette Hotze, MFT, Treating Therapist

9    On April 26, 2013 Ms. Kennedy saw Bernadette Hotze, MFT. (AR 401.) Ms. Hotze found Ms.

10   Kennedy to be calm with a flat affect, without psychoses or suicidal thoughts, and to have a

11   cooperative and open attitude. (*Id*.) The treatment notes say that Ms. Kennedy "presented with

12   feelings of detachment, lack of motivation, restricted range of affect" and a "sense of

13   foreshortened future" as well as "insomnia, difficulty concentrating, flashbacks and nightmares."

14   (*Id*.)

15   Ms. Kennedy next saw Ms. Hotze on June 12, 2013. (AR 396.) Ms. Hotze performed a

16   Clinical Assessment of Ms. Kennedy at that time. (AR 396-98.) Ms. Hotze found Ms. Kennedy to

17   be depressed, irritated, and anxious, with labile affect, hallucinations, and suicidal thoughts. (AR

18   397.) Ms. Kennedy reported to Ms. Hotze that she had a history of trauma in some form from

19   1963 to 2009, including periods of domestic violence. (AR 396.) Ms. Kennedy also reported that

20   since the robbery she heard voices and saw shadows, and that she never felt safe. (*Id*.) Ms.

21   Kennedy further reported that she had insomnia or else she "can sleep for days on end." (AR 396.)

22   Ms. Hotze diagnosed Ms. Kennedy with PTSD and a major depressive disorder with psychosis

23   which was recurrent and severe. (AR 398.)

24   Ms. Hotze found Ms. Kennedy to have significant impairments in the activities of daily living,

25   in her social relationships, and in the education/occupation/job area. (AR 399.)

26

### 34. Dr. P. M., Treating Physician

27   On June 17, 2013, Ms. Kennedy saw Dr. P. M. (AR 426.) The doctor said Ms. Kennedy's

28   condition had improved with the reissuance of her Zoloft, Haldol, and Clonazepam prescriptions.

United States District Court
Northern District of California

1  (*Id.*)

2       Ms. Kennedy saw Dr. P. M. again on July 18, 2013. (AR 424.) The doctor found Ms.

3  Kennedy anxious and fidgety. (*Id.*) Ms. Kennedy reported having hallucinations and an increase in

4  anxiety and fear. (*Id.*) The doctor increased her Zoloft and Clonazepam prescriptions. (AR 425.)

5  **C. Written Testimonies**

6       ***1. Ms. Kennedy's Work History Report—Form SSA-3369-BK***

7       On January 7, 2012, Ms. Kennedy filled out a work history report. (AR 227-35.) On that

8  report, Ms. Kennedy stated that her daily activities included vacuuming, dusting, washing dishes,

9  doing laundry, caring for a pet cat, and cooking dinner for herself and her son. (AR 228–29.) Ms.

10  Kennedy also reported that she drives a car, shops for groceries, and manages her finances. (AR

11  230.) Ms. Kennedy stated that she goes outside as little as possible and that she shops in stores

12  once or twice a month but just for the things that she and her son need as she "can't be in crowds

13  of people for very long." (*Id.*) She also stated that she does not spend time with others as she does

14  not want to be around people. (AR 231.)

15       Ms. Kennedy reported her hobbies and interests to be crafts, sewing, gardening, and

16  computers. (*Id.*) She also stated that she had lost interest in craft projects.

17       Ms. Kennedy reported that she cannot be at home alone during the day or at night, with night

18  being the worst. (AR 228, 232.) She stated that she suffers from extreme anxiety at night when she

19  is alone. (AR 232, 234.)

20       Ms. Kennedy also stated that she can walk a "couple of blocks" before needing to rest and then

21  can resume walking in about 5 or 10 minutes. (AR 232.) Ms. Kennedy also reported that she

22  "cannot pay attention at all" and that she feels "disconnected from life." (*Id.*) She stated that she

23  can follow written instructions unless they are difficult and that she used to be good at following

24  spoken instructions but that she is not good at it anymore. (*Id.*) She also stated that while she

25  always took pride in her professionalism, her pride in herself and anything she does is gone. (AR

26  233.) Ms. Kennedy reported that she does not handle stress or changes in routine well. (AR 233.)

27  Ms. Kennedy also reported having had panic attacks. (AR 234.)

28

United States District Court
Northern District of California

### *2. Matt Kennedy's Third-Party Function Report*

On January 12, 2012, Ms. Kennedy's son, Matt Kennedy, completed a Third-Party Function Report concerning his mother's activities. (AR 240-47.) Mr. Kennedy confirmed that Ms. Kennedy cooked, cleaned, did the laundry, and took care of the cat. (AR 240-41.) He also confirmed that Ms. Kennedy was afraid to go out in the dark and that she did not sleep well. (AR 241.) Mr. Kennedy reported that Ms. Kennedy shopped about 2-3 times a month and that she went out of the house a "couple of times a week." (AR 244.)

Mr. Kennedy stated that his mother forgets things, gets bored often, and does not see her friends anymore. (AR 245.) He also noted that she is scared, nervous, and anxious. (AR 246.) He stated that he has gotten calls from her saying that she is "home alone and scared to death" and that she randomly cries and has panic attacks. (AR 247.) He also reported that she will sleep for days at a time because of depression and that she gets irritated easily. (*Id.*)

### *3. Dr. Young's Mental Disorder Questionnaire Form and Medical Source Statement*

On April 26, 2012, in response to the SSA's request, Dr. Young completed a Mental Disorder Questionnaire Form about Ms. Kennedy. (AR 351-56.) He reported that Ms. Kennedy had complained of severe anxiety with panic attacks and severe depression, and that she had suicidal ideation. (AR 351.) Dr. Young reported that Ms. Kennedy had trouble sleeping, "social phobia/anxiety," and progressive isolation and withdrawal to home. (AR 353.) He noted that she was being treated with "ongoing therapy and antidepressants." (AR 351.)

Dr. Young reported his observations of Ms. Kennedy as severely anxious, "frequently tearful," but always cooperative." (AR 352.) He noted that she was "very limited" in her ability to interact with the public and that she was "unable to function with multiple persons." (AR 353-54.) Dr. Young described Ms. Kennedy's ability to concentrate and complete tasks as "poor"; he said that she had poor focus and attention. (AR 354.) He found her adaptation to work or work-like situations to be impaired by decreased mood and anxiety. (*Id.*) Dr. Young diagnosed Ms. Kennedy with major depression that was recurrent and severe, with a panic disorder, and with general anxiety. (AR 355.) Dr. Young opined that Ms. Kennedy's prognosis was "guarded." (*Id.*)

Dr. Young also completed a Medical Source Statement about Ms. Kennedy. (AR 358-59.) Dr.

Young described Ms. Kennedy's ability to understand and remember detailed or complex instructions to be "poor" and her ability to understand very short and simple instructions to be "fair." (AR 358.) Doctor Young stated that Ms. Kennedy's ability to carry out instructions, attend and concentrate, and work without supervision, with regard to "sustained concentration and task persistence," were all "poor." (*Id*.) The doctor described Ms. Kennedy's abilities to interact with public and coworkers to be "poor" and with supervisors to be "fair." (AR 359.) The doctor described Ms. Kennedy's abilities to adapt to changes in the workplace, to be aware of normal hazards and react appropriately, and to use public transportation or travel to unfamiliar places, all to be "poor." (*Id*.)

### 4. Dr. Kim Morris, Psy. D., and Dr. Tanya Brode: State Agency Non-Examining Consultants

On June 28, 2012, Kim Morris, Psy. D., reviewed Ms. Kennedy's file. Her overall assessment was that Ms. Kennedy's allegations were "partially credible." (AR 85.) She noted that Ms. Kennedy had been in treatment for less than a year at the time of her review and that Ms. Kennedy was benefitting from medication. (*Id*.) Dr. Morris found that the Medical Source Statement from Dr. Young was "more limiting than warranted based on [the] overall evidence" and therefore she gave it only partial weight. (*Id*.) Dr. Morris concluded that Ms. Kennedy would be capable of completing simple tasks that involve limited public contact. (*Id*.)

With regard to the "A" Criteria of the listings, Dr. Morris found that Ms. Kennedy's Affective Disorders and Anxiety-Related Disorders were medically determinable impairments but that they did not "precisely satisfy the diagnostic criteria" of 12.04 and 12.06. (AR 86.)

With regard to the "B" Criteria of the listings, Dr. Morris found that Ms. Kennedy had only a "mild" restrictions on the activities of daily living, and "moderate" "difficulties in maintaining social functioning," and in "concentration, persistence, or pace." (*Id*.) Dr. Morris determined that the "C" Criteria were unsatisfied. (*Id*.) The consultants found that there was insufficient evidence with which to evaluate "repeated episodes of decompensation." (AR 86, 99.)

Dr. Morris found that Ms. Kennedy's description of her symptoms was only "partially credible" because the "severity of allegations [was] not supported by objective findings" and Ms.

Kennedy had no history of treatment prior to July 2011. (AR 87.)

In terms of Ms. Kennedy's Residual Functional Capacity, Dr. Morris found Ms. Kennedy to be "not significantly limited" in her ability to do the following: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (AR 88-89.)

Dr. Morris found Ms. Kennedy to be "moderately limited" in her ability to do the following: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independent of others. (*Id.*)

Dr. Morris determined that Ms. Kennedy did not have the Residual Functional Capacity to perform her past relevant work, as her past work involved the public and was semi-skilled/skilled work. (AR 91.) Dr. Morris found that Ms. Kennedy would not be limited to unskilled work because of her impairments, nor did she have any physical limitations. (*Id.*) In her report, Dr. Morris cited the following three occupations as consistent with Ms. Kennedy's restrictions and which exist in significant numbers in the national economy: flower picker; worm picker; or vine pruner. (*Id.*)

On December 21, 2012, State Agency Non-Examining Consultant Dr. Tawnya Brode, Psy.D., reviewed and affirmed all of Dr. Morris's findings. (AR 111-126.)

United States District Court
Northern District of California

### 5. Dr. Young's Medical Source Statement

On September 6, 2012, in response to the SSA's request, Dr. Young completed another Medical Source Statement about Ms. Kennedy. (AR 444-46.) The doctor found that Ms. Kennedy's conditions had an "extreme" effect on her ability to do the following: understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public; and respond appropriately to work pressures in a usual work setting. (AR 444–45.)

Dr. Young stated that Ms. Kennedy's conditions had a "marked" effect on her ability to: understand, remember, and carry out short, simple instructions; interact appropriately with supervisors and co-workers; and respond appropriately to changes in work routine. (*Id*.) Dr. Young stated that the medical/clinical findings supporting his assessments were Ms. Kennedy's "impaired cognition and mood," which affected her memory, judgment and energy. (AR 444.) Dr. Young also stated that his assessments were supported by Ms. Kennedy's "social anxiety and agoraphobia." (*Id*.) Dr. Young noted that Ms. Kennedy's "mood and cognitive impairment impacts [her] ability to adapt." (AR 445.)

### 6. Psychological Evaluation by Dr. Lea K. Tate, Psy. D., State Agency Examiner

After Ms. Kennedy's hearing before the ALJ, the SSA referred Ms. Kennedy for a psychological evaluation. On October 4, 2013, Dr. Tate prepared a psychological evaluation report on Ms. Kennedy. (AR 449-53.) Dr. Tate interviewed Ms. Kennedy and administered three tests to her, the Weschler Adult Intelligence Scale, the Weschler Memory Scale, and the Color Trails Test. (AR 449.) Dr. Tate also reviewed Ms. Kennedy's medical records. (*Id*.)

Dr. Tate noted that Ms. Kennedy was depressed and tearful throughout the entire appointment, but that she was cooperative and completed all tasks. (AR 451.) Dr. Tate's testing found that Ms. Kennedy had "significant memory impairment" and that Ms. Kennedy's scores indicated that she may have difficulty "recalling information in daily living and may indicate problems in psychosocial functioning due to memory dysfunction." (AR 452.) Dr. Tate's testing indicated that Ms. Kennedy was in the average range in her ability to plan and sequence and in her flexibility of thought. (*Id*.)

Dr. Tate also found Ms. Kennedy to be in the low-average range of intelligence. (AR 453.) Dr. Tate further stated that Ms. Kennedy would benefit from continued therapy and medication and that Ms. Kennedy was unable to handle funds in her best interest. (*Id*.)

Dr. Tate completed a Medical Source Statement regarding Ms. Kennedy. (AR 454-56.) Dr. Tate said that Ms. Kennedy's impairments had a "mild" effect on her ability to: understand, remember, and carry out short and simple instructions. (AR 454–55.) Dr. Tate described the impact of Ms. Kennedy's impairments as "moderate" on her ability to do the following: make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to work pressures in a usual work setting and to changes in work routine. (*Id*.) Dr. Tate found that Ms. Kennedy's impairments had a "marked" effect on her ability to: understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. (AR 454–55.)

Dr. Tate noted generally that Ms. Kennedy had memory impairments and difficulty with reasoning skills related to her "significant history of abuse, depression, anxiety" and her PTSD symptoms (which were secondary to her having been held at gunpoint and also her time in prison). (AR 454.) Dr. Tate also noted that Ms. Kennedy was "unable to manage her emotions in an appropriate way" and that she was "terrified of the public, strangers [and] new places." (AR 455.) Dr. Tate stated that Ms. Kennedy "displays emotional disintegration," which included tears, negative thoughts about herself, increased anxiety and hyper-vigilance. (*Id*.)

**C. Administrative Hearing**

*1. Plaintiff's Testimony*

Ms. Kennedy appeared in person before the ALJ at the August 27, 2013 hearing. (AR 55.) At the hearing, the ALJ and the plaintiff's counsel discussed what the correct "onset" date should be for Ms. Kennedy's disability. (AR 61–62.) Because the purported time period of disability overlapped with time Ms. Kennedy was employed or incarcerated, Ms. Kennedy's attorney stipulated to an adjusted disability onset date of October 31, 2010. (*Id*.)

The ALJ explained to Ms. Kennedy that he would be asking her questions pertaining to four subject matters: background, past work, daily living activities, and medical problems that kept her

United States District Court
Northern District of California

1   from working. (AR 55.)

2   After asking Ms. Kennedy some background questions about her living situation and her

3   education, the ALJ questioned Ms. Kennedy about her past work experience. Ms. Kennedy

4   testified about her work as a bartender, a restaurant manager, and a cafeteria worker. (AR 56-60.)

5   The ALJ also asked Ms. Kennedy about her eight-month term of imprisonment for having taken

6   money out of her employer's safe. (AR 60-61.)

7   The ALJ next questioned Ms. Kennedy about what housework she performed. (AR 63.) Ms.

8   Kennedy stated that she did her own laundry sometimes but that her son vacuumed, mopped, and

9   cleaned the bathroom. (AR 63.) Ms. Kennedy testified that she no longer cooked, grocery

10   shopped, gardened, or did crafts projects. (AR 64-66.) The ALJ questioned Ms. Kennedy about the

11   inconsistency between her testimony at the hearing and the "activities report" she completed on

12   January 7, 2012, which stated a much greater level of activity than Ms. Kennedy was testifying to

13   at the hearing. (AR 64-65.) The ALJ specifically noted that on the January 2012 report, Ms.

14   Kennedy stated that she was cooking dinner every night for 30-40 minutes, vacuuming, dusting

15   and doing the dishes, doing some gardening, and shopping once or twice a month. (AR 65.) Ms.

16   Kennedy responded that her symptoms had worsened. (AR 64.) Ms. Kennedy testified that she had

17   stopped doing much of the housework at least six months prior to the hearing (AR 65) and that she

18   had stopped engaging in her hobbies a year prior to the hearing (AR 66).

19   Ms. Kennedy stated that in the two years prior to the hearing she had lost contact with her

20   friends. (*Id.*) She said she did not engage in any activities with her four children. (AR 66-67.) Ms.

21   Kennedy said she rarely interacted with her sisters, and that while she had a monthly visit from her

22   mother, the visit took place only in Ms. Kennedy's home. (*Id.*)

23   The ALJ then questioned Ms. Kennedy about her medications. (AR 67.) Ms. Kennedy said she

24   takes Zoloft, Wellbutrin, Klonopin, and Haldol at bedtime. (AR 67-68.) Ms. Kennedy added that

25   the Klonopin makes her "feel drunk" when she takes it. (AR 67.) Ms. Kennedy stated that the

26   doctor had just prescribed her Lamictal as a "mood stabilizer," but that she did not think it had

27   started working yet. (AR 67-68.) Ms. Kennedy stated that she also took Xaponex for anxiety. (AR

28   68.) Ms. Kennedy said that she no longer used alcohol and had never used street drugs or

United States District Court
Northern District of California

1    marijuana. (*Id*.)

2        Ms. Kennedy's attorney then questioned her on topics the ALJ had covered. (*Id*.) Counsel

3    asked Ms. Kennedy to describe her sleep pattern. Ms. Kennedy testified that she did not have a

4    regular sleep pattern. She said she wakes up "almost hourly" and also that she had "slept for five

5    days straight." (AR 69.) She further testified that when she is home alone at night, she hears

6    voices, sees shadows, and has to lock herself in the bedroom to protect herself from somebody

7    who might be trying to get into the house. (AR 69-70.)

8        Counsel then asked Ms. Kennedy to characterize the way she gets along with others. (AR 70.)

9    Ms. Kennedy testified that she does not get along with people. (*Id*.) She stated that she is irritated

10   if she is asked a question or has to get up; she yells at people and then starts crying. (*Id*.) Ms.

11   Kennedy testified that she finds it "hard to deal with people" so she has isolated herself. (*Id*.)

12       When asked what her doctors told her, Ms. Kennedy testified that the doctors said she has

13   agoraphobia and they did not give her any particular time frame for recovery. (AR 70-71.) Ms.

14   Kennedy said that her agoraphobia and fears began shortly after the robbery and her termination

15   from Denny's in January of 2008. (AR 71–72.) Ms. Kennedy said that after the robbery, she was

16   so afraid of the dark that she would frequently stay at work all night just so she would not have to

17   walk home in the dark. (AR 71.)

18       Ms. Kennedy's attorney asked her about side effects from her medications. (AR 72.) Ms.

19   Kennedy stated the Klonopin makes her feel "drunk" and the other medications make her sick to

20   her stomach all the time and light-headed. (AR 72-73.) Ms. Kennedy said she had been

21   experiencing those symptoms before she went to the Crisis Unit in July 2011. (AR 73-74.)

22       Counsel for Ms. Kennedy then asked about her memory. (AR 74.) Ms. Kennedy said that she

23   forgets things, gets confused about years and dates, and sometimes walks away from a

24   conversation unable to remember what she talked about. (*Id*.) Ms. Kennedy stated that if someone

25   were to give her instructions on how to do a procedure, she would be unlikely to remember what

26   the instructions had been. (*Id*.)

27       Ms. Kennedy said she drives a car to the doctor, but she does not feel she is being safe because

28   she is "constantly looking in [the] rearview mirror instead of where she is going." (AR 74-75.)

United States District Court
Northern District of California

### *2. Testimony of the Vocational Expert, Joy Yoshioka*

The ALJ posed a hypothetical to the Vocational Expert, Ms. Yoshioka. He asked Ms. Yoshioka whether a person limited to simple, unskilled work without frequent public or fellow-employee contact could perform Ms. Kennedy's prior work as a bartender, a restaurant manager, a cook, or a cafeteria attendant. (AR 76.) Ms. Yoshioka testified that a person with those limitations could not perform those jobs. (*Id*.)

The ALJ asked Ms. Yoshioka to identify any jobs available in significant numbers which met those limitations. (*Id*.) Ms. Yoshioka said the positions of cleaner, laundry worker, and garment sorter met those criteria and all required "light" strength-levels. (AR 76-77.)

The ALJ then asked Ms. Yoshioka to identify three "medium" strength-level jobs under the same hypothetical. (AR 77.) Ms. Yoshioka identified the positions of recycler, auto detailer, and kitchen helper. (*Id*.)

Counsel for Ms. Kennedy then asked the VE to explain the difference between the cook position, for which Ms. Kennedy was no longer qualified, and the kitchen helper position, which Ms. Kennedy could perform under the hypothetical. (*Id*.) Ms. Yoshioka explained that the kitchen helper position was more typically a dish washer or dish busser. (AR 77-78.) Ms. Yoshioka testified that unlike the cook position, these last two positions require less than frequent employee or customer contact. (AR 78.)

### *3. The ALJ's Findings*

Applying the sequential evaluative process, the ALJ held on November 18, 2013, that Ms. Kennedy was not "under a disability as defined in the Social Security Act from October 31, 2010, through the date of [the] decision" and therefore was not entitled to disability insurance benefits. (AR 28.)

At step one, the ALJ found that Ms. Kennedy met the insured status requirements of the Social Security Act through December 31, 2014, and that she had not engaged in substantial gainful activity since October 31, 2010. (AR 21.)

At step two, the ALJ found that Ms. Kennedy had severe impairments of PTSD and depression. (*Id*.)

1    At step three, the ALJ found that Ms. Kennedy did not have an impairment or combination of

2    impairments that met or medically equaled the criteria of listings 12.04 and 12.06. (AR 22.) In

3    making this determination the ALJ considered whether "paragraph B" criteria were satisfied. The

4    ALJ found that Ms. Kennedy did not meet the "paragraph B" criteria, requiring at least two

5    marked restrictions on the activities of daily living, maintaining social functioning, maintaining

6    concentration, persistence, or pace, or repeated episodes of decompensation (defined as three

7    episodes within one year each lasting for at least two weeks). (*Id.*)

8    The ALJ considered the evidence of Ms. Kennedy making simple foods, paying bills, driving a

9    car, and caring for her roommate's property and found Ms. Kennedy had only mild restrictions on

10   the activities of daily living. (*Id.*) The ALJ found that Ms. Kennedy "is still able to socialize

11   adequately with various family members including her children and parents." (*Id.*) The ALJ stated

12   that despite being treating for depressed and anxious mood, Ms. Kennedy demonstrated open,

13   calm, appropriate, and cooperative behavior. (*Id.*) Based on that evidence, the ALJ found Ms.

14   Kennedy to have only moderate difficulties in social functioning.

15   The ALJ found Ms. Kennedy to have only moderate difficulties in maintaining concentration,

16   persistence, or pace based on Ms. Kennedy performing household chores, doing the laundry,

17   shopping, driving, and paying bills. (AR 22-23.) The ALJ next found Ms. Kennedy had

18   experienced no episodes of decompensation of extended duration. (AR 23.)

19   The ALJ found that Ms. Kennedy did not meet the "paragraph C" criteria as there was no

20   evidence of (1) repeated and extended periods of decompensation, (2) a likelihood of

21   decompensation in response to changes in mental demands or environment, or (3) an inability to

22   function outside of a highly supportive environment. (AR 23.)

23   At step four, the ALJ found Ms. Kennedy had the residual functional capacity to perform a full

24   range of work at all exertional levels but with the nonexertional limitation of performing simple

25   unskilled work with no frequent [public] or fellow employee contact. (*Id.*) The ALJ found that Ms.

26   Kennedy's medically determinable impairments could reasonably be expected to cause the alleged

27   symptoms, but that Ms. Kennedy's statements concerning the intensity, persistence and limiting

28   effects of these symptoms were not entirely credible. (AR 23-24.) The ALJ found that reports that

Ms. Kennedy was "better" with treatment and that she was "fully oriented, alert, appropriate, cooperative and calm" were inconsistent with Ms. Kennedy's reported symptoms. (AR 24.)

The ALJ also took into consideration that while the robbery Ms. Kennedy alleges as the "major source" of her mental health symptoms occurred in 2008, Ms. Kennedy did not seek any treatment until 2011. (*Id.*) Additionally, the ALJ found that Ms. Kennedy had not required any psychiatric hospitalizations, crisis interventions, intensive psychiatric treatment, or emergency department visits for uncontrolled symptoms. (*Id.*) Ms. Kennedy had not been in regular therapy since December 2012 or had any therapy sessions since April 2013. (*Id.*)

The ALJ noted that Ms. Kennedy continued to work after the robbery until 2009, when she was fired for stealing from her employer. (AR 24–25.) The ALJ found the fact that Ms. Kennedy's impairments did not prevent her from working until 2009 suggested that she would not currently be prevented from working. (AR 25.)

The ALJ questioned Ms. Kennedy's credibility because he found her statements about her symptoms and limitations inconsistent and unpersuasive. (*Id.*) The ALJ cited as example Ms. Kennedy's testimony at the hearing that her medications made her feel sick to her stomach, light-headed, nauseated, and drunk while the treatment notes show few, if any, complaints of side effects. (*Id.*) The ALJ also noted that previously, Ms. Kennedy had reported being able to clean her house, shop, garden, and do crafts but at the time of the hearing, Ms. Kennedy claimed she no longer did any of those things because she was "worse." (*Id.*) The ALJ found Ms. Kennedy's testimony that she was worse inconsistent with the medical records showing that she had improved with treatment. (AR 24-25.)

The ALJ also found Ms. Kennedy's testimony about her ability to work to be inconsistent to the opinions of Dr. Tate and the psychological consultants Dr. Morris and Dr. Brode. (AR 25.) The ALJ gave Dr. Tate's testimony great weight because it was based on direct examination, personal observation, and objective testing. (*Id.*) The ALJ found Dr. Tate's opinion consistent with the overall medical records showing that Ms. Kennedy improved with treatment and with the results of Ms. Kennedy's mental status examinations which showed Ms. Kennedy to have intact cognition. (*Id.*)

1     Dr. Tate found that Ms. Kennedy could do the following: perform simple tasks with moderate

2  limitations; interact appropriately with the public, supervisors and coworkers; and respond to

3  changes. (*Id.*) The ALJ also gave great weight to the opinions of Dr. Morris and Dr. Brode who

4  found that Ms. Kennedy "could sustain simple tasks in a limited public setting." (AR 25.) The ALJ

5  found Dr. Morris's and Dr. Brode's opinions consistent with Ms. Kennedy's treatment records and

6  with Dr. Tate's findings. (*Id.*)

7     The ALJ found that the statement by Ms. Kennedy's son showed that despite Ms. Kennedy's

8  mental health symptoms, she remained "quite functional" and that she was able to clean, cook,

9  shop for groceries, move about the community, manage her finances, watch television, and do

10  crafts. (AR 26.)

11     The ALJ assigned little weight to the opinions of Dr. Young. The ALJ found Dr. Young's

12  opinions "appear to rely heavily on [Ms. Kennedy's] own subjective statements rather than on

13  objective findings of mental disease, and [seem] to accept uncritically as true most, if not all, of

14  what [Ms. Kennedy] reported." (*Id.*) The ALJ also found Dr. Young's opinions unsupported by

15  Dr. Young's own examination findings. (*Id.*) The ALJ found an inconsistency between (1) Dr.

16  Young's statement that Ms. Kennedy has impaired cognition and memory and an inability to think

17  coherently, and (2) his treatment notes, which state that Ms. Kennedy's thoughts are clear and well

18  organized, her speech is clear, and her memory is intact. (*Id.*)

19     At step five, The ALJ found that while Ms. Kennedy could not perform any of her past

20  relevant work, Ms. Kennedy could work with the ALJ's specified non-exertional limits of

21  performing simple, unskilled work with no frequent public or employee contact, as a cleaner,

22  laundry worker, garment sorter, recycler, auto detailer, or kitchen helper, all jobs that exist in

23  significant numbers in the national economy. (AR 27-28.)

## ANALYSIS

## I.   STANDARD OF REVIEW

26     Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

27  commissioner if the claimant initiates the suit within sixty days of the decision. District courts

28  may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal

United States District Court
Northern District of California

error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

## II.  APPLICABLE LAW

An SSDI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B). There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).
>
> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.** Considering the claimant's RFC, age, education, and work experience,

United States District Court
Northern District of California

is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the commissioner.

## III. DISCUSSION

Ms. Kennedy challenges the ALJ's decision on three grounds: (1) the ALJ failed to give adequate weight to the opinions of Ms. Kennedy's treating physician; (2) the ALJ made an RFC finding that is insufficient as a matter of law and not supported by the record; and (3) the ALJ erred in discounting Ms. Kennedy's credibility. (MSJ, ECF No. 17 at 6.)

### A.  The ALJ erred by giving Dr. Young's opinion little weight.

Ms. Kennedy argues that the ALJ failed to give sufficient weight to the opinions of her treating physician, Dr. Young. (MSJ, ECF No. 17 at 11–16.) In making his residual functional capacity determination, the ALJ accorded great weight to the opinions of consultative psychologist Dr. Tate and to the two non-examining state agency psychological consultants, Dr. Morris and Dr. Brode. (AR 25.) The ALJ accorded little weight to the opinions of treatment provider Dr. Young. (AR 26.)

Ms. Kennedy asserts that the ALJ erred by rejecting the opinions of her treatment provider Dr. Young without providing specific, legitimate reasons supported by substantial evidence. (MSJ, ECF No. 17 at 14.) Ms. Kennedy further argues that the ALJ erred by giving Dr. Young's opinions little weight as his findings were consistent with the findings of the consultative psychologist Dr. Tate. (*Id*. at 15.)

In determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The

United States District Court
Northern District of California

opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)). "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

Dr. Young completed Medical Disorder and Medical Source Statements about Ms. Kennedy

1    on April 26, 2012 and a follow-up Medical Source Statement on September 6, 2012. (AR 357-59,

2    443-46.) The ALJ referenced Dr. Young's findings in those statements that Ms. Kennedy had

3    "poor ability to maintain concentration, interact with others, and adapt to changes" and that she

4    had "marked to extreme limitations in most areas." (AR 26.) The ALJ gave these opinions "little

5    weight," however, for the following reasons: (1) he found the opinions inconsistent with the

6    treatment notes showing that Ms. Kennedy was improving; (2) he found Dr. Young relied on Ms.

7    Kennedy's subjective statements rather than on objective findings; and (3) he found Dr. Young to

8    have accepted uncritically as true what Ms. Kennedy reported. (*Id.*)

9        An ALJ may give an opinion less weight where the statement is not "well-supported by

10   medically acceptable clinical and laboratory diagnostic techniques." *Orn*, 495 F.3d at 631 (quoting

11   20 C.F.R. § 404.1527(d)(2)). Because Dr. Young did not administer any tests to Ms. Kennedy, the

12   ALJ appropriately considered this factor in giving Dr. Young's opinions less weight. But an ALJ

13   "does not provide clear and convincing reasons for rejecting an examining physician's opinion by

14   questioning the credibility of the patient's complaints where the doctor does not discredit those

15   complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of Soc.*

16   *Sec.*, 528 F.3d 1194, 1199-200 (9th Cir. 2008). Here Dr. Young's Medical Source Statement

17   indicates that the limitations he ascribes to Ms. Kennedy are based on his "medical/clinical

18   findings." (AR 444.)

19       The ALJ appropriately found that there were indications in the treatment records from 2013

20   that Ms. Kennedy's condition was improving. (*See e.g.*, AR 430 (1/4/13 – Ms. Kennedy doing

21   "much better"); AR 425 (6/17/13 – Ms. Kennedy's condition "improved"). But these reports are

22   interspersed with other reports which are less positive. (*See e.g.*, AR 428 (3/25/13 – Ms.

23   Kennedy's functioning "impaired"); AR 396 (4/26/13 – Ms. Kennedy depressed, irritated, and

24   anxious with suicidal thoughts). *See also Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)

25   ("it is error for an ALJ to pick out a few isolated instances of improvement over a period of

26   months or years and to treat them as a basis for concluding a claimant is capable of working.")

27   (citation omitted.) The ALJ should not have rejected Dr. Young's opinions based on inconsistent

28   reports of improvement by Ms. Kennedy.

United States District Court
Northern District of California

1    Additionally, the ALJ should have accorded Dr. Young's findings in the Medical Source

2    Statements more weight because they were consistent with the findings of other treatment

3    providers. *Orn*, 495 F.3d at 631 (unless a treatment provider's findings are "inconsistent with the

4    other substantial evidence in [the] case record, [they will be given] controlling weight.") Dr.

5    Young's findings were corroborated in large part by consultative examiner Dr. Tate's findings in

6    October 2013. (AR 454-55.) Dr. Young found that Ms. Kennedy had a poor ability to interact with

7    the public and with co-workers and that she would have a poor ability to adapt to changes in the

8    workplace. (AR 445.) He also found that Ms. Kennedy's cognition was impacted by her

9    depression and anxiety. (AR 352, 444.)

10    Dr. Tate found that Ms. Kennedy's impairments had a "marked" effect on her ability to

11    understand, remember, and carry out complex instructions and make judgments on complex work-

12    related decisions. (AR 454–55.) Dr. Tate also noted that Ms. Kennedy had memory impairments

13    and difficulty with reasoning skills related to her "significant history of abuse, depression,

14    anxiety" and her PTSD symptoms. (AR 454.) Dr. Tate found that Ms. Kennedy was "unable to

15    manage her emotions in an appropriate way" and that she was "terrified of the public, strangers

16    [and] new places." (AR 455.) Dr. Tate stated that Ms. Kennedy "displays emotional

17    disintegration," which included tears, negative thoughts about herself, increased anxiety, and

18    hyper-vigilance. (*Id.*)

19    To the extent that the ALJ rejected Dr. Young's opinions in favor of non-examining

20    consultative evaluations Dr. Morris and Dr. Brode, this also was error. The opinion of a non-

21    examining medical advisor cannot by itself constitute substantial evidence that justifies the

22    rejection of the opinion of an examining or treating physician. *Morgan*, 169 F.3d at 602. Here, the

23    ALJ improperly used the opinions from a non-examining medical advisors as a justification to

24    reject the treating physicians' diagnoses of Ms. Kennedy. (AR 25.)

25    Because the ALJ gave great weight to Dr. Tate's findings, and Dr. Tate's findings are

26    generally consistent with Dr. Young's findings, it was error for the ALJ to have accorded Dr.

27    Young's findings little weight.

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

**B. The ALJ's RFC Determination is Flawed**

The ALJ found that Ms. Kennedy could perform a full range of work at all exertional levels. The ALJ determined that Ms. Kennedy's RFC included the following nonexertional limitation: "perform[ing] simple unskilled work with no frequent [public] or fellow employee contact." (AR 23.) Ms. Kennedy argues that the ALJ's RFC determination is flawed in the following ways: (1) the RFC does not address Ms. Kennedy's limitations on concentration, persistence, and pace; and (2) the RFC does not sufficiently account for Ms. Kennedy's limitations on social functioning. (MSJ, ECF No. 17 at 6-11.)

### 1. The ALJ erred by not including Ms. Kennedy's limitations in concentration, persistence, and pace in the RFC and in the hypothetical to the Vocational Expert

Ms. Kennedy argues that the ALJ failed to include Ms. Kennedy's known limitations of concentration, persistence, and pace in the RFC and in the hypothetical posed to the vocational expert as he was required to do by SSR 85-16. (MSJ, ECF No. 17 at 8–10.) Ms. Kennedy argues that while the ALJ's RFC determination referenced "unskilled work," such a limitation is legally insufficiently to encompass Ms. Kennedy's limitations on concentration, persistence, and pace and therefore the hypotheticals posed to the vocational expert were flawed.

"A hypothetical question posed to a vocational expert must 'include all of the claimant's functional limitations, both physical and mental.'" *Brink v. Commissioner Social Sec. Admin.*, 343 Fed.Appx. 211, 212 (9th Cir. 2009) (quoting *Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995).). "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993)); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Ms. Kennedy argues that the ALJ's hypothetical was inaccurate because it referenced "unskilled" work and did not explicitly account for her limitations in concentration, persistence and pace.

The statutory definition of "unskilled work" is

> Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568.

The Commissioner argues that the RFC was sufficient because the ALJ 's limitation of "unskilled" work captures limitations on "concentration, persistence, and pace." (Cross-Motion, ECF No. 18 at 12.) The Ninth Circuit has held, however, that an RFC which limits the claimant to "unskilled work" does not in and of itself capture limitations of concentration, persistence, and pace. *Lubin v.Comm'r Social Sec. Admin*., 507 Fed.Appx. 709, 712 (2013); *Brink,* 343 Fed.Appx. at 212 (simple, repetitive work does not encompass difficulties with concentration, persistence or pace).

The Commissioner cites to *Hoopai v. Astrue*, 499 F.3d 1071 (9th Cir. 2007), and *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008), as support for her position. Those cases do not change the outcome as both cases are factually distinguishable from the current case. The *Hoopai* court held that an ALJ is required to rate the claimant's concentration, persistence, and pace limitations, and that the ALJ "clearly met this requirement by rating and assessing" this limitation. *Hoopai*, 499 F.3d at 1077–78. In *Stubbs–Danielson*, the court found that the medical evidence in the record did not establish any limitations in concentration, persistence, or pace." *Stubbs-Danielson*, 539 F.3d at 1174.

As noted above, Dr. Tate (on whose opinion the ALJ placed great weight) found that Ms. Kennedy's impairments had a "marked" effect on her ability to understand, remember, and carry out complex instructions. (AR 454–55.)  Additionally, Dr. Young described Ms. Kennedy's ability to concentrate and complete tasks as "poor" and that she had "poor" focus and attention. (AR 354.) Similarly, Dr. Young described Ms. Kennedy's ability to understand and remember detailed or complex instructions to be "poor," and said that her ability to carry out instructions, attend and

concentrate, and work without supervision, with regard to "sustained concentration and task persistence," were all "poor." (AR 358.)

Because the record supports the conclusion that Ms. Kennedy has limitations on concentration, persistence, and pace, it was error for the ALJ to fail to include those limitations in the RFC and in the hypotheticals he posed to the vocational expert and the ALJ's RFC limitation to "unskilled work" was insufficient for that purpose.

### 2. The RFC's limitation on social functioning is sufficient

The RFC limits Ms. Kennedy to positions with "no frequent [public] or fellow employee contact." (AR 23.) SSR 83-10 defines "frequent" to be "occurring from one-third to two-thirds of the time." Ms. Kennedy argues that the medical records support a greater social functioning limitation than that reflected in the RFC. (MSJ, ECF No. 17 at 10.)

An ALJ's finding of limitations in an RFC are to be upheld if they are supported by "substantial evidence." 42 U.S.C. § 405(g); *Vasquez,* 572 F.3d at 591 (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew,* 53 F.3d at 1039 .

In support of this limitation, the ALJ cited to Ms. Kennedy's "treatment notes that consistently reported calm, cooperative and appropriate behaviors." (AR 26.) The ALJ also relied on the evidence in the record that Ms. Kennedy worked for more than a year following the traumatic event causing her alleged disabilities. (AR 266.) During that time, Ms. Kennedy reported no inability to work due to limitations on her ability to interact with others. (AR 59–60, 216, 266) There is sufficient evidence in the record to uphold the ALJ's determination regarding Ms. Kennedy's ability to work with limited public and co-worker contact.

Moreover, although Dr. Tate reported that Ms. Kennedy was "terrified" of strangers, Dr. Tate concluded that Ms. Kennedy had only a "moderate" impairment in her ability interact appropriately with the public, supervisors, and co-workers. (AR 454–55.) Dr. Young found Ms. Kennedy's abilities to interact and with supervisors to be "fair" and with public and coworkers to be "poor." (AR 359.)

United States District Court
Northern District of California

1    The two consultative examiners Dr. Morris and Dr. Brode found Ms. Kenney "not

2    significantly limited" in her ability ask simple questions or request assistance, accept instructions

3    and respond appropriately to criticism from supervisors, and get along with coworkers or peers

4    without distracting them or exhibiting behavioral extremes. (AR 88-89.) Dr. Morris found Ms.

5    Kennedy to be only "moderately limited" in her ability to work in coordination with or in

6    proximity to others without being distracted by them and to interact appropriately with the general

7    public. (AR 88-89.)

8    The ALJ must consider the record as a whole.  SSR 96-5p. Taking the record as a whole, the

9    ALJ acted appropriately in limiting Ms. Kennedy to "no frequent public or fellow employee

10   contact."

11   **C. The ALJ Properly Evaluated the Credibility of Ms. Kennedy's Testimony**

12   In evaluating a claimant's credibility, "the ALJ can reject the claimant's testimony about the

13   severity of her symptoms only by offering specific, clear and convincing reasons for doing so."

14   *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (citing *Smolen* v Chaten, 80 F.3d 1273,1281 (9th Cir.

15   1996).) The court defers to the ALJ's credibility determination if it is supported by substantial

16   evidence in the record.

17   The ALJ gave specific, clear and convincing reasons for discounting Ms. Kennedy's

18   testimony. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ questioned Ms.

19   Kennedy's general credibility because she "made inconsistent and unpersuasive statements about

20   her symptoms and limitations." The ALJ gave as an example Ms. Kennedy's testimony at the

21   hearing that her medications "make her feel sick to her stomach, light-headed, nauseated and

22   drunk" when the treatment notes mentioned "few, if any, complaints of side effects." (AR 25.)

23   The ALJ also questioned Ms. Kennedy's testimony at the hearing she no longer did any house

24   cleaning, shopping, cooking or crafts. (AR 25, 65.) The ALJ found these statements inconsistent

25   with Ms. Kennedy's January 2012 report that she was able to vacuum, dust, wash dishes, do

26   laundry, drive, move about the community independently, shop for groceries, sew, and garden.

27   (AR 25.) To the extent that Ms. Kennedy stated that she had stopped doing all of these things

28   because her condition had "worsened," the ALJ stated that he found her testimony "inconsistent

with medical opinions in the record" including Dr. Tate's finding that Ms. Kennedy was capable of performing simple tasks. (*Id*.)

The ALJ has the discretion to evaluate the claimant's credibility under many factors, including "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ found that Ms. Kennedy could drive a car, shop for groceries, pay her bills, and handle cash. (AR 26.)

Ms. Kennedy finally argues that the ALJ's credibility determination is legally insufficient because it does did not take her "strong work history" into account. (MSJ, ECF No. 17 at 21–22.) Ms. Kennedy argues that 20 C.F.R. § 404.1529(c)(3) requires the ALJ to take her prior work history into account in evaluating her symptoms. (*Id.* at 22.) The ALJ clearly did consider Ms. Kennedy's work history. (AR 25.) He found that the fact that Ms. Kennedy worked in 2009 after the alleged triggering event for her disability in 2008 weighed against the credibility of her disability claim. (*Id.*) The ALJ also found relevant the fact that Ms. Kennedy stopped working "not due to her mental illness" but because she was caught stealing from her employer. (AR 25.) The ALJ therefore sufficiently considered Ms. Kennedy's prior work history.

## CONCLUSION

For the foregoing reasons, Ms. Kennedy's motion is granted in part, the commissioner's motion is denied, and the case is remanded for further proceedings consistent with this order.

This disposes of ECF Nos. 17 and 20.

**IT IS SO ORDERED.**

Dated: September 29, 2015

_____

LAUREL BEELER
United States Magistrate Judge